1
2
3
4
5
6                         UNITED STATES DISTRICT COURT
7                         EASTERN DISTRICT OF CALIFORNIA
8

9    JONATHAN SCOTT INGLES,           No. 1:19-cv-00075-GSA

10             Plaintiff,

11      v.                     **ORDER DIRECTING ENTRY OF**
                                 **JUDGMENT IN FAVOR OF**
12   ANDREW SAUL, Commissioner of Social   **COMMISSIONER OF SOCIAL SECURITY**
     Security,                       **AND AGAINST PLAINTIFF**
13

14             Defendant.

15

16
17      **I.**      **Introduction**

         Plaintiff Jonathan Scott Ingles ("Plaintiff") seeks judicial review of the final decision of
18
the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application
19
for supplemental security income pursuant to Title XVI of the Social Security Act.  The matter is
20
currently before the Court on the parties' briefs which were submitted without oral argument to
21
the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 12, 15 and 16.  Having
22
reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial
23
evidence and applicable law. Accordingly, Plaintiff's appeal is denied.
24
      **II.**     **Procedural Background**
25
         On May 18, 2010, Plaintiff filed an application for supplemental security income alleging
26
disability beginning January 1, 1997 (the "2010 application").  AR 142.  The Commissioner
27

28      ―――――――――――
[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 7 and 8.

1   denied the 2010 application initially on October 22, 2010, and following reconsideration on

2   March 18, 2011.  AR 142. After a timely request for a hearing, Administrative Law Judge Tamia

3   N. Gordon presided at a hearing on April 3, 2012.  AR 142.  Plaintiff appeared and was

4   represented by an attorney.  AR 142.  The ALJ denied the 2010 application on April 13, 2012.

5   AR 142-54.  Plaintiff did not appeal the adverse decision which then became final.

6         On June 5, 2013, Plaintiff filed the pending application for supplemental security income

7   alleging disability beginning January 1, 1988.  AR 164.  The Commissioner denied the

8   application initially on November 22, 2013, and following reconsideration on February 25, 2014.

9   AR 164.

10         On May 6, 2014, Plaintiff filed a request for a hearing.  AR 164.  Administrative Law

11   Judge Sharon L. Madsen presided over an administrative hearing on August 11, 2015.  AR 72-97.

12   Plaintiff appeared and was represented by an attorney.  AR 72. At the beginning of the hearing

13   Plaintiff amended the alleged onset date to June 5, 2013.  AR 74.  On September 18, 2015, the

14   ALJ denied Plaintiff's application.  AR 164-78.

15         On May 26, 2017, following an appeal by Plaintiff, the Appeals Council remanded the

16   case to the Administrative Law Judge.  AR 183-87.  The Appeals Council directed the ALJ to (1)

17   obtain expert evidence to clarify the nature and severity of Plaintiff's impairments; (2) rate the

18   degree of difficulty resulting from Plaintiff's mental impairments in several specified areas; and,

19   (3) further consider Plaintiff's maximum residual functional capacity, providing appropriate

20   rationale with citations to the record with specific attention to the opinions of Dr. Atmajian and

21   Plaintiff's mother, Ms. Betty Persson.  AR 185.

22         On November 2, 2017, ALJ Madsen conducted the remand hearing.  AR 43-71.  Plaintiff

23   appeared and was represented by an attorney.  AR 43.  On March 7, 2018, the ALJ denied

24   Plaintiff's application.  AR 15-36.

25         The Appeals Council denied review on December 3, 2018.  AR 1-6.  On January 16, 2019,

26   Plaintiff filed a complaint in this Court.  Doc. 1.

27   ///

28   ///

III.     **Factual Background**

     A.     **Medical Records**[2]

Testing results dated October 2010 reported that Plaintiff tested positive for Q fever and Typhus fever.  AR 603-04.

The record includes the treatment records of psychiatrist John Middleton, M.D., from March 2010 to September 2017.  AR 637-76, 779-80, 783-93.  In July 2015 and August 2017, Dr. Middleton executed verifications of incapacity for Fresno County in relation to Plaintiff's eligibility for general relief, noting recurrent psychosis, chronic anxiety, febrile confusion, poor focus and concentration.  AR 781-82, 794-95.

From March to November 2011, Tha Cha, M.D., provided pain management services to Plaintiff for groin, buttocks and shoulder pain following a 2010 accident in which a car hit Plaintiff's bicycle.  AR 463-546.  Services included medication, diagnostic imaging and a referral for physical therapy.

From January 2012 to March 2017, Plaintiff received medical care at Fresno Shields Medical Center.  AR 560-75, 609-30, 698-712, 715-17.  His diagnoses included generalized pain, hyperlipidemia, hyperthyroid, degenerative joint disease (shoulder), COPD, panic attacks, insomnia, rheumatoid arthritis, anemia and chronic Q fever (stable).  AR 560-75, 698-709.

In April 2013, Plaintiff received mental health treatment in the emergency department of Community Regional Medical Center (CRMC).  AR 549-52.  Jimmy Donkor, M.D., noted that Plaintiff experienced chronic hallucinations, insomnia, and agitation.  AR 549.  Because Plaintiff was depressed but did not contemplate harming himself or someone else, the hospital released him the same day.  AR 549, 551.

In May 2014, Plaintiff again received treatment at the CRMC emergency department.  AR 770-71.  Plaintiff, who had run out of his medications, displayed anxiety and flat affect.  AR 770.

///

_____

[2] Except for evidence bearing on matters questioned in the pending case, such as whether Plaintiff had actually tested positive for Q fever, this decision does not detail evidence presented in the prior proceedings.  Because Plaintiff does not challenge the Commissioner's determination concerning Plaintiff's physical impairments, only basic information concerning physical impairments is included to provide background and context.

1    In February 2015, Dr. Lasher examined Plaintiff as part of Plaintiff 's continuing

2  methadone treatment at Aegis Medical Systems.  AR 606-07.  The doctor noted that Plaintiff had

3  then been receiving methadone treatment for six years.  AR 606.  In June 2015, Plaintiff

4  transferred treatment to BAART Programs.  AR 632-34.

5    Plaintiff was treated in the CRMC emergency department twice in September 2015.  AR

6  760-69.  Plaintiff was experiencing generalized pain, severe headaches and insomnia.  AR 760-

7  69.  In addition, Plaintiff was very anxious reporting that his neighbors were listening in on his

8  conversations.  AR 768.

9    For three days in January 2016, Plaintiff was hospitalized at CRMC for chest pain and a

10  herpes zoster rash (shingles) that affected his forehead and right eye.  AR 734-51.  Testing

11  determined that Plaintiff had normal cardiac function.  AR 756-59.

12    In February 2016, Brian Chinnock, M.D., treated Plaintiff in the CRMC emergency

13  department for neurologic memory loss and recurrent one-sided headaches following his January

14  hospitalization.  AR 727-33.

15    In March 2017, Plaintiff was treated in the emergency department of CRMC for bilateral

16  swelling, pain and limited range of motion of his lower legs and feet.  AR 718-26.  Dan F.

17  Savage, M.D., noted Plaintiff's sudden weight gain of thirty pounds, shortness of breath and

18  labored breathing on exertion.  AR 722.  The doctor diagnosed bilateral pedal edema of unknown

19  etiology.  AR 721.

20    From March through August 2017, Plaintiff had regular appointments at the Family

21  Wellness Clinic where he was treated by San Gabriel, M.D., and Evette Gabriel, P.A.  AR 677-

22  87.  Diagnoses included COPD, ankylosing spondylosis, Q fever, hypothyroid, chronic low back

23  pain and multiple abnormal lab results.  AR 677-87. Imaging studies indicated degenerative

24  changes of the lumbar and lower thoracic spine and grade 1 spondylolisthesis at L4-L5 including

25  a 7-8 mm. anterior subluxation.  AR 777-78.

26    Dr. Gabriel referred Plaintiff to Jaswant Basraon, M.D. for a cardiology consultation.  AR

27  680.  Dr. Basraon reported normal results but warned that Plaintiff was at risk for coronary or

28  pulmonary disease.  AR 688-97.  He encouraged Plaintiff to stop smoking.  AR 689.

4

### B.   Plaintiff's Testimony

Plaintiff (born March 1965) shared a two-bedroom apartment with first two, then one, roommates.  AR 47, 76.  At the time of the first hearing Plaintiff slept on a sofa in the living room, but he moved to one of the bedrooms when the third roommate left.  AR 76.  He supported himself with general relief and food stamps.  AR 47-48, 76.  His parents assisted him with rent. AR 47.

Plaintiff's household responsibilities were sweeping the kitchen floor, taking out the garbage and changing the kitty litter.  AR 86.  He cooked in a microwave oven and did his own dishes and laundry.  AR 48-49.  Because of low back pain and weakness Plaintiff had difficulty lifting and carrying objects such as a laundry basket.  AR 55.

Plaintiff testified that he could sit for about two hours at a time and stand for about 45 minutes at a time.  AR 56.  He needed to lie down after about fifteen minutes of doing household chores.[3]  AR 62.  He could walk about a half block, sometimes more.  AR 56.  Plaintiff could pay attention for one-half hour or less.  AR 57.

Plaintiff completed high school and some college.  AR 77.  He had a driver's license but drove only to the grocery store and medical appointments.  AR 76-77.

On a typical day Plaintiff ate breakfast and spent most of his time in bed, sometimes watching a few hours of television.  AR 78.  At the first hearing he reported that since he had been sicker he had stopped walking and exercising because walking exacerbated his symptoms. AR 78-79.  By the second hearing he had begun to take short walks.  AR 50. He became winded after ten or fifteen minutes of activity.  AR 80.

Plaintiff reported body pain, thyroid problems, shortness of breath, numbness of his legs,

///

---

[3] Plaintiff explained that he could not sit down because he did not have a chair.  AR 62.

fatigue and severe headaches.  AR 50-54, 79-80.  Ibuprofen was his only pain medication.[4]  AR 54, 80.  Plaintiff had difficulty obtaining medical care.  AR 81.  At the second hearing, Plaintiff was confused about the names and purposes of his medications.  AR 58-59.  Inability to sleep affected his mental health the following day.  AR 65.  His poor breathing sometimes woke him during the night.  AR 65.

Plaintiff experienced depression and worried about "what [he] might do," testifying "I don't know how much longer the suffering is going to go on."  AR 83.  He felt nervous and did not like to be around others.  AR 83.  Plaintiff had difficulty sleeping and attributed a breakdown several years earlier to his inability to sleep.  AR 84.  He understood that the voices that he heard were not real but he still heard them.  AR 60. Those symptoms resolved with medication.  AR 84.  Plaintiff, a former heroin addict, received most of his counseling through the methadone center.  AR 85.

Plaintiff was able to dress himself and perform his own personal hygiene.  AR 77.  Since he had been sicker, he had been doing less housework.  AR 77.  He had no social activities but occasionally had lunch with his mother.  AR 78.  Just before the second hearing Plaintiff reconnected with his adult daughter and attended her wedding.  AR 49.

## C.    Mother's Testimony

Plaintiff's mother, Betty Persson, did not live nearby but had telephone conversations with Plaintiff several times weekly and visited Plaintiff and his sister about every two months.  AR 90.

After deteriorating physically for many years, Plaintiff had tested positive for Q fever three or four years prior to the 2015 hearing.[5]  AR 90-91.  He was constantly fatigued with pain

///

---

[4] The record suggests that Plaintiff's doctors avoided prescribing addictive medications due to Plaintiff's history of addictive behavior.
[5] Plaintiff's sister also tested positive for Q fever.  AR 93.

6

and muscle weakness.  AR 91.  Plaintiff also had ankylosing spondylitis with overall skeletal deterioration.  AR 91.

Plaintiff's mental capacity had been poor since he attempted suicide by shooting himself when he was 21.[6]  AR 91.  He was in and out of mental facilities for about five years thereafter before stabilizing at a level "pretty close to normal."  AR 91.  In recent years he had developed extreme paranoia, auditory and visual hallucinations, and great fear and anxiety.  AR 91.  His sleep was greatly disrupted.  AR 91.  Ms. Persson observed that in the course of a single conversation Plaintiff could appear stable at some points and reveal paranoia and hallucinations at other points.  AR 92.  He was frequently out of touch with reality.  AR 92.

In a third-party adult function report, Ms. Persson noted that because Plaintiff had little interest in personal care, he showered and changed clothes infrequently.  AR 344.  She also reported hand tremors that impaired his ability to shave and feed himself.  AR 344.

### IV.    Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v.*
///

---

[6] Plaintiff shot himself in the head.  AR 58.  The record does not indicate whether injuries resulting from the gunshot wound contributed to Plaintiff's mental health or physical impairments.

7

1  *Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks

2  omitted).

3     If the evidence reasonably could support two conclusions, the court "may not substitute its

4  judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112

5  F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "[T]he court will not reverse an ALJ's

6  decision for harmless error, which exists when it is clear from the record that the ALJ's error was

7  inconsequential to the ultimate non-disability determination."  *Tommasetti v. Astrue*, 533 F.3d

8  1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

9     **V.    The Disability Standard**

10  > To qualify for benefits under the Social Security Act, a plaintiff must
   establish that he or she is unable to engage in substantial gainful
11  activity due to a medically determinable physical or mental
   impairment that has lasted or can be expected to last for a continuous
12  period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A).
   An individual shall be considered to have a disability only if . . . his
13  physical or mental impairment or impairments are of such severity
   that he is not only unable to do his previous work, but cannot,
14  considering his age, education, and work experience, engage in any
   other kind of substantial gainful work which exists in the national
15  economy, regardless of whether such work exists in the immediate
   area in which he lives, or whether a specific job vacancy exists for
16  him, or whether he would be hired if he applied for work.

17  > 42 U.S.C. §1382c(a)(3)(B).

18     To achieve uniformity in the decision-making process, the Commissioner has established

19  a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§

20  416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding

21  that the claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

22     Specifically, the ALJ is required to determine: (1) whether a claimant engaged in

23  substantial gainful activity during the period of alleged disability, (2) whether the claimant had

24  medically determinable "severe impairments," (3) whether these impairments meet or are

25  medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P,

26  Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to

27  perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs

28  existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).

8

1    In addition, when an applicant has one or more previous denials of applications for

2    disability benefits, as Plaintiff does in this case, he must overcome a presumption of non-

3    disability. The principles of *res judicata* apply to administrative decisions, although the doctrine

4    is less rigidly applied to administrative proceedings than in court. *Chavez v. Bowen,* 844 F.2d

5    691, 693 (9th Cir. 1988); *Gregory v. Bowen,* 844 F.2d 664, 666 (9th Cir. 1988).

6    Social Security Acquiescence Ruling ("SSR") 97–4, adopting *Chavez,* applies to cases

7    involving a subsequent disability claim with an unadjudicated period arising under the same title

8    of the Social Security Act as a prior claim in which there has been a final administrative decision

9    that the claimant is not disabled. A previous final determination of non-disability creates a

10   presumption of continuing non-disability in the unadjudicated period.  *Lester v. Chater,* 81 F.3d

11   821, 827 (9th Cir. 1995). The presumption may be overcome by a showing of changed

12   circumstances, such as new and material changes to the claimant's residual functional; capacity,

13   age, education, or work experience. *Id.* at 827–28; *Chavez,* 844 F.2d at 693.

14       **VI.    <u>Summary of the ALJ's Decision</u>**

15   In the initial hearing decision dated September 18, 2015, the Administrative Law Judge

16   determined that Plaintiff's medical profile had changed little since the April 2012 decision except

17   that Plaintiff had been diagnosed with chronic obstructive pulmonary disease (COPD).  AR 165.

18   In addition, Plaintiff's age category had changed from that of a younger individual to an

19   individual closely approaching advanced age.  AR 165, 176.  As a result the ALJ concluded that

20   the *Chavez* presumption of non-disability did not apply.  AR 165.  The ALJ did not repeat the

21   *Chavez* analysis following the Administrative Council remand.

22   The ALJ found that Plaintiff had not engaged in substantial gainful activity since the

23   alleged onset date of June 5, 2013.  AR 17.  His severe impairments included: lumbar

24   degenerative disc disease; thoracic degenerative disc disease; chronic obstructive pulmonary

25   disease; reported history of Q fever;[7] status post pelvic fracture; right shoulder degenerative joint

26   disease; obesity; tobacco dependence; schizoaffective disorder; attention deficit disorder; history

27

28

---

[7] Throughout the record, various individuals questioned the veracity of Plaintiff's reporting his history of Q fever, which is a rare disease, especially in its chronic form.  Laboratory reports dated October 2010 established Plaintiff's positive diagnosis.  AR 603.

of anxiety disorder; and, history of methamphetamine and opiate dependence.  AR 18.  None of the severe impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).  AR 18.

The ALJ concluded that Plaintiff had the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently; sit six to eight hours in an eight-hour workday with normal breaks; and, stand or walk six to eight hours in an eight-hour workday with normal breaks.  AR 20.  He could occasionally stoop, crouch, and climb ladders, ropes and scaffolds.  AR 20.  He must avoid concentrated exposure to dust, gases and fumes.  AR 20.  Plaintiff was limited to simple, routine tasks with only occasional public contact.  AR 20.

Plaintiff had no past relevant work.  AR 34.  Considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs available in significant numbers in the national economy that Plaintiff could perform.  AR 34.  Accordingly, the ALJ found that Plaintiff was not disabled at any time from June 5, 2013, the alleged disability onset date, through March 7, 2018, the date of the decision.  AR 35-36.

### VII.      Sufficient Evidence Supported the ALJ's Determination at Step Four

Focusing solely on his alleged mental health impairments, Plaintiff contends that the ALJ erred in rejecting the opinions of Drs. Middleton and Khalifa in favor of other medical conclusions in the record.  The Commissioner counters that substantial evidence in the record supported the ALJ's determination of Plaintiff's residual functional capacity and that the ALJ appropriately applied the medical evidence to determine that Plaintiff had the ability to perform simple, routine tasks.

### A.      Medical Opinions on Plaintiff's Mental Health

#### 1.  Agency Experts

On initial review, psychologist Brady Dalton, Psy.D., found no evidence that Plaintiff was not capable of simple work.  AR 108.  Dr. Dalton adopted the agency analyst's findings including

10

that Plaintiff had moderately limited functioning, limited social skills and residual ability to

perform unskilled work in a nonpublic work setting.  AR 106.   The analyst also recommended

that the agency adopt the 2012 determination that Plaintiff was not disabled.  AR 108.  After

performing the psychiatric review technique, Dr. Dalton opined that the treatment records of

Plaintiff's treating psychiatrist J. Middleton did not support Dr. Middleton's opinion that Plaintiff

had marked and extreme limitation in all domains.  AR 108.  In contrast, consultative examiner

Dr. Khalifa opined that Plaintiff had no impairments for simple tasks or work,  AR 108.

Additionally, the record included no evidence that Plaintiff's psychiatric impairments had

changed markedly since the decision in the 2010 case,  AR 108.

      Dr. Dalton opined that Plaintiff was not significantly limited in remembering locations

and work-like procedures; understanding, remembering and carrying out very short and simple

instructions; performing activities within a schedule, maintaining regular attendance and being

punctual within customary tolerances; sustaining an ordinary routine without special supervision;

making simple work-related decisions; asking simple questions or requesting assistance;

accepting instructions and responding appropriately to supervisors; getting along with coworkers

or peers without distracting them or exhibiting behavioral extremes; maintaining socially

appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of

normal hazards and taking appropriate precautions; and, traveling to unfamiliar places and using

public transportation.  AR 111-13.  Plaintiff was moderately limited in understanding,

remembering and carrying out detailed instructions; maintaining attention and concentration for

extended periods; working in coordination with or proximity to others without being distracted by

them; completing a normal workday and workweek without interruptions from psychologically

based symptoms and performing at a consistent pace without an unreasonable number and length

of rest periods; interacting appropriately with the general public; responding appropriately to

changes in the work setting; and; setting realistic goals and making plans independently of others. AR 111-13.

On reconsideration  psychologist Judith Levinson, Ph.D., agreed with Dr. Brody's initial assessment.  AR 125.  Dr. Levinson added that Dr. Middleton had not responded to her requests for additional evidence supporting his assessment of Plaintiff's functional capacity.  AR 125. After performing the psychiatric review technique, Dr. Levinson agreed with the initial determination that Plaintiff had adequate mental capacity for simple work.  AR 127.

On initial review, the agency found no material change in any regard to overcome the *Chavez* presumption of non-disability.  AR 104.

## 2.  Consultative Psychiatric Evaluation

On October 20, 2013, psychiatrist Soad Khalifa, M.D., provided a comprehensive psychiatric evaluation.  AR 580-83.  Dr. Khalifa described Plaintiff as unshaven, quiet, slow and appearing sedated.  AR 581.  Dr. Khalifa repeatedly questioned the reliability of Plaintiff's representations. For example, Dr. Khalifa rejected Plaintiff's report he took methadone for pain because Plaintiff received it from a methadone clinic, which suggested a history of heroin or opiate abuse.  AR 581.  Plaintiff had a history of alcohol and Vicodin abuse.  AR 581.  Dr. Khalifa believed Plaintiff was exaggerating his symptoms.  AR 581, 582.

Dr. Khalifa diagnosed:

| | |
|---|---|
| Axis I: | Polysubstance abuse, by history |
| | Opiate dependence |
| | Dysthymic disorder |
| Axis II: | Deferred |
| Axis III: | Joint pain |
| | Arthritis |
| | I would say rule out Q fever, because he is not really reliable, there is no proof that he has any physical illness, there is no actual proof, he seems to be exaggerating, I think. |

///

Axis IV:      Physical problems.
Axis V:       GAF = 60

AR 582-83.[8]

Dr. Khalifa opined that because Plaintiff had an extensive history of drug abuse and was

smoking cigarettes and using methadone, he was unable to manage his own funds.  AR 83.  The

doctor continued:

> He should be able to perform simple tasks.  He will have difficulty
> performing detailed tasks because of his depressive symptoms and
> anxiety symptoms and the limited social skills.
>
> For these reasons, he will have difficulty accepting instructions from
> supervisors, performing work activities on a consistent basis,
> maintain regular attendance while dealing with the stress in the
> workplace.

AR 583.

### 3.   Medical Source Statement: Dr. Middleton

On January 10, 2014, Plaintiff's treating psychiatrist John Middleton, M.D., completed a

form entitled Physical Residual Functional Capacity Medical Source Statement based on

Plaintiff's progress and office notes.  AR 599-602.  Dr. Middleton diagnosed:

Axis I:       Schizoaffective disorder
Axis II:      Attention deficit disorder
Axis III:     none
Axis IV:      Financial
Axis V:       GAF = 50

AR 599.[9]

---

[8] The Global Assessment of Functioning (GAF) scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 51-60 corresponds to moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

[9] A GAF of 41-50 corresponds to serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job).. *Diagnostic and Statistical Manual of Mental Disorders* at 32-35.

13

Dr. Middleton described Plaintiff's prognosis as fair, explaining that although Plaintiff's disorder was chronic, he would generally be stable as long as he complied with treatment.  AR 599.  Plaintiff's medications included Abilify, Dexedrine and Xanax.  AR 599.

In Dr. Middleton's opinion, Plaintiff would have no limitations understanding, remembering and carrying out very short and simple instructions, and making simple work-related decisions.  AR 601.  Plaintiff's limitations in being aware of normal hazards and taking appropriate precautions would preclude performance of his job about five percent of the workday.  AR 599-600.  Specifically, Plaintiff would be limited in his ability to ask simple questions or request assistance about five percent of the workday.  AR 601.  Limitations in responding appropriately to changes in the work setting and travelling to unfamiliar places, or using public transportation would interfere with performance about ten percent of the workday.  AR 599-600.  Specifically, Plaintiff would experience limitations in the following about ten percent of the workday: remembering locations and work-like procedures; working in coordination with or in proximity to others without being distracted by them; and, interacting appropriately with the general public.  AR 601.  Limitations in setting realistic goals and making plans independently of others would interfere fifteen or more percent of the workday.  AR 599-600.  Specifically, Plaintiff would experience limitations in the following fifteen percent or more of the workday: understanding, remembering and carrying out detailed instructions; maintaining attention and concentration for extended periods of time; performing activities within a schedule, maintaining regular attendance and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; completing a normal workday and workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without

14

distracting them or exhibiting behavioral extremes; and, maintaining appropriate behavior and

adhering to basic standards of neatness and cleanliness.  AR 601.

Plaintiff would be off task about 30 percent of the workday.  AR 600.  He was likely to

be absent from work five days or more monthly and unable to complete five or more additional

days monthly.  AR 600.  Dr. Middleton was unsure whether Plaintiff could manage his own

benefit payments.  AR 602.

In August 2015, Dr. Middleton wrote the following letter in support of Plaintiff's claim

for disability benefits:[10]

> [Plaintiff has been a patient of this office since March 2010.  His medications currently include Abilify, Mirtazapine, Zolpidem, Diazepam, and Dexedrine for chronic and recurrent symptoms of depression, anxiety, psychosis, insomnia and impaired attention.  Numerous medication changes have been made over the years.
>
> Despite adherence to medications, he continues to have symptoms as above, sometimes increasing to severe levels.  At times, he can be quite psychotic, experiencing auditory hallucinations and paranoia.
>
> [Plaintiff] has chronically impaired concentration, attention, focus and memory.  He frequently describes being anxious and worried "all the time."  He has history of recurrent depressive episodes, which includes [a] serious self harm attempt many years ago (with a handgun).  [Plaintiff] has also reported serious head injuries in the past.
>
> Due at least primarily to these impairments he has been hit by vehicles as a pedestrian, he has been homeless, he has been assaulted, and has generally been poorly functional.
>
> Given the longevity, chronically, and severity of his psychiatric symptoms, it is clear that his prognosis for successful employment is poor.
>
> AR 635.

///

///

---

[10] The record does not indicate whether Dr. Middleton prepared this letter in support of Plaintiff's Social Security disability application or Plaintiff's ongoing benefits from Fresno County general assistance.  The reference to "reinstatement of disability benefits" and its preparation at about the same time as Dr. Middleton's 2015 verification of incapacity suggests the latter.

1

**B.    Determining Residual Functional Capacity**

2    "Residual functional capacity is an assessment of an individual's ability to do sustained

3    work-related physical and mental activities in a work setting on a regular and continuing basis."

4    SSR 96-8p.  The residual functional capacity assessment considers only functional limitations and

5    restrictions which result from an individual's medically determinable impairment or combination

6    of impairments.  SSR 96-8p.

7    A determination of residual functional capacity is not a medical opinion, but a legal

8    decision that is expressly reserved for the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2) (RFC

9    is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC).

10    "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual

11    functional capacity." *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so the

12    ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary

13    ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995).

14    "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the

15    record such as medical records, lay evidence and the effects of symptoms, including pain, that are

16    reasonably attributed to a medically determinable impairment." *Robbins*, 466 F.3d at 883.  *See*

17    *also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant

18    medical and other evidence).  "The ALJ can meet this burden by setting out a detailed and

19    thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and

20    making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v.*

21    *Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).

22    The opinions of treating physicians, examining physicians, and non-examining physicians

23    are entitled to varying weight in residual functional capacity determinations. *Lester*, 81 F.3d at

24    830.  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

25    opportunity to know and observe the patient as an individual.  *Id.*; *Smolen v. Chater*, 80 F.3d

26    1273, 1285 (9th Cir. 1996).  The opinion of an examining physician is, in turn, entitled to greater

27    weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th

28    Cir. 1990).  An ALJ may reject an uncontradicted opinion of a treating or examining medical

1    professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a

2    contradicted opinion of a treating professional may be rejected for "specific and legitimate"

3    reasons.  *Id.* at 830.   However, the opinions of a treating or examining physician are "not

4    necessarily conclusive as to either the physical condition or the ultimate issue of disability."

5    *Morgan v. Comm'r of Soc. Sec. Admin*., 169 F.3d 595, 600 (9th Cir. 1999).

6              **C.**      **The ALJ Properly Analyzed Evidence in the Record as a Whole**

7        "[A]n ALJ is responsible for determining credibility and resolving conflicts in medical

8    testimony." *Magallanes*, 881 F.2d at 750.  An ALJ may choose to give more weight to opinions

9    that are more consistent with the evidence in the record.  20 C.F.R. §§ 404.1527(c)(4) ("the more

10    consistent an opinion is with the record as a whole, the more weight we will give to that

11    opinion"). A claimant's statement of pain or other symptoms is not conclusive evidence of a

12    physical or mental impairment or disability.  42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p,

13    2017 WL 5180304 (Oct. 25, 2017).  "An ALJ cannot be required to believe every allegation of

14    [disability], or else disability benefits would be available for the asking, a result plainly contrary

15    to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

16        Evaluating Plaintiff's residual functional capacity following the Appeals Council's

17    remand, the second hearing decision set forth an unusually lengthy and detailed analysis.  AR 20-

18    34. Plaintiff challenges only the findings concerning the functional results of his mental health

19    impairments.

20        The analysis began with a detailed summary of Plaintiff's testimony, finding it not to be

21    fully consistent with the objective medical evidence of record.  AR 20-23.  Ms. Persson's

22    subjective testimony was similarly inconsistent with the objective medical evidence  AR 32-33.

23    Accordingly, the ALJ gave the subjective testimony minimal weight.  AR 33.

24        The ALJ gave limited weight to Dr. Khalifa's  Plaintiff should be able to perform simple,

25    but not detailed, tasks to be only partially consistent with the record as a whole  AR 26.  In

26    particular, Dr. Khalifa's opinion did not reflect the activities of daily living to which Plaintiff

27    testified, the beneficial effects of treatment and Plaintiff's decreased symptoms with appropriate

28    sleep.  AR 26.

1    The decision set forth significant analysis of Dr. Middleton's opinions and treatment

2    record, but ultimately gave little or no weight to many of the opinions.  AR 26-28.  For example,

3    Dr. Middleton's 2014 medical source statement opined both that Plaintiff's symptoms remained

4    stable as long as Plaintiff complied with this medication regimen, but also that Plaintiff's

5    impairments would preclude performance of multiple functions more than fifteen percent of the

6    workday.  AR 26-27.  Contrasting the doctor's subjective opinions to his treatment notes and

7    other records, the ALJ concluded that Dr. Middleton overstated the severity of Plaintiff's

8    impairments and their effect on his ability to function.  AR 27.  For example, Dr. Middleton's

9    2015 letter advocating for Fresno County benefits was in sharp contrast to contemporaneous

10   treatment records documenting Plaintiff's fair prognosis, reduced symptoms, reduction in

11   medication and satisfaction with mental health improvement.  AR 27-28.  Finally, the decision

12   emphasized that Dr. Middleton's conclusory opinion that Plaintiff was unable to work was

13   entitled to no weight because the ultimate determination of ability to work is one reserved to the

14   Commissioner.  AR 28.  *See* SSR 96-5p; 20 C.F.R. § 416.927(e).

15   Although the decision acknowledged that some medical evidence in the record predated

16   the time period at issue for this application and was therefore not directly relevant to Plaintiff's

17   current residual functional capacity, it noted that evidence submitted in support of the 2010

18   application provided background concerning Plaintiff's impairments and facilitated consideration

19   of any improvement or progression of symptoms since the prior decision.  AR 23.  The ALJ

20   began her analysis by considering the 2010 opinion of Dr. Steven Swanson that despite a history

21   of polysubstance dependence, Plaintiff was able to maintain concentration,; relate appropriately to

22   others in a job setting; handle funds in his own best interest; understand, carry out and remember

23   simple instructions; and, respond appropriately to work situations including attendance, safety

24   and changes in routine.  AR 25.

25   The decision concluded that Plaintiff's mental impairments had not significantly changed

26   since the 2012 decision:

27       [T]he prior Administrative Law Judge determined that the claimant
         could perform work limited to one or two-step tasks consistent with
28       SVP 2 level work or below as defined by the *Dictionary of*

18

*Occupational Titles* and only occasional interaction with the public.

I accord great weight to the prior Administrative Law Judge's analysis of the evidence and opinions and, as noted in this decision, adopt additional limitations as appropriate.

The current evidence confirms that the claimant continues to experience schizoaffective symptoms, anxiety, and attention deficits. The claimant also has a history of polysubstance abuse with his primary substance abuse history involving heroin and cocaine. However, he has demonstrated prolonged and sustained abstinence from drug and alcohol use.

The Disability Determination Service psychiatric consultants agreed with the prior Administrative Law Judge mental residual functional capacity and summarized the findings and limitations. Dr. Judith Levinson, Ph.D., noted the claimant alleged depression and Attention Deficit Hyperactivity Disorder. H had a prior application on similar allegations which was denied at the hearing level in part on the basis of adequate mental capacity for simple work. The medical evidence of record from Community Regional Medical Center and the consultative examiner's opinion reflects evidence of a history of polysubstance dependence and depression.   The claimant's psychiatric treatment history includes recent evaluation for involuntary services in relation to mood instability including psychosis and ongoing opioid antagonist therapy for maintenance of the claimant's abstinence from heroin.  Although records from Dr. Middleton include a medical source statement reflecting marked and extreme limitations in all functional domains, there is no psychiatric diagnosis reported or associated with this statement and it is not supported by treatment notes.  Thus, the origin of such impairments is unclear and Dr. Middleton's medical source statement is given no weight.  The current mental status examinations indicate that the claimant is  alert, oriented and cooperative.  His stream of mental activity is normal and goal oriented.  His performance on the mini mental status examination included no impairments with recall or serial     subtractions     suggesting     intact/adequate     attention, concentration and memory.  The assigned global assessment of functioning is consistent with the claimant's adaptive functioning and reflects no more than moderate limitations.  The consultative examiner's findings reflect no impairments for simple tasks or work. These findings are consistent with prior consultative examiner's findings and reflect no evidence of change or deterioration of claimant's condition since the Administrative Law Judge decision. Thus, the medical evidence of record as a whole (including the prior Administrative Law Judge decision) reflects no marked psychiatric impairments and suggests adequate mental capacity for simple work and the claimant will likely work best in settings with infrequent public interaction.

Since the Disability Determination Service determination, the only evidence received at the hearing level is not sufficiently compelling to warrant a significant deviation from these conclusions.  As noted above, Dr. Middleton's medical source statement is not persuasive or consistent with his own treatment record; however, the treatment

records are consistent with the prior Administrative Law Judge mental residual functional capacity and the more recent Disability Determination Service conclusions that the claimant could perform simple, routine job tasks wit only occasional contact with the public.

AR 31-32 (citations to administrative record omitted).

### D.   Summary

In assessing his own residual functional capacity, Plaintiff would interpret his symptoms and treatment differently to reach a conclusion of greatly diminished residual functional capacity. The Court is not required to accept Plaintiff's characterization of his treatment records or the severity of his impairments.  The ALJ fully supported her determination based on the medical opinions and the evidence of record.  Even if this Court were to accept that the record could support Plaintiff's opinion, the record amply supports the ALJ's interpretation as well.  When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner.  *Jamerson*, 112 F.3d at 1066; *Flaten v. Sec'y, Health and Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

### VIII.   *Res Judicata* Did Not Compel Adoption of the Language Utilized in the Prior Residual Functional Capacity Assessment

Plaintiff contends that because ALJ Madsen "gave great weight to the prior ALJ['s] analysis of the evidence and opinions and 'adopt[ed] additional limitations as appropriate'" (Doc. 12 at 6), but "provided no basis for deviating from the prior finding under the doctrine of administrative *res judicata* or collateral estoppel" ( Doc. 12 at 7), *res judicata* required her to define Plaintiff's reasoning ability using the same language as the 2012 decision.  The 2018 decisions used the phrase "simple, routine tasks" instead of the language used the 2012 hearing decision, "one- or two-step tasks consistent with SVP 2 level work or below."  Doc. 12 at 8. Defendant disagrees, explaining that after a claimant has overcome the presumption of non-disability in a subsequent proceeding, as Plaintiff has here, the presiding ALJ need not give preclusive effect to the prior ALJ's findings when new evidence has been introduced in the subsequent proceedings.  Doc. 15 at 18.

## A. Identifying a Claimant's Reasoning Ability

At step five, a uniform system of nomenclature is used to describe the availability of jobs that are within or outside a claimant's reasoning ability.   In 1965, the third edition of the *Dictionary of Occupational Titles* eliminated the previously used terms, "skilled," "semi-skilled" and "unskilled," in favor of eight separate categories of "specific vocational preparation" (SVP). Specific Vocational Preparation is "defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility in a specific job-worker situation." *Dictionary of Occupational Titles*, vol. II at 1011.  In the case of SVP 1, learning the job requires no more than a short demonstration and requires the worker to apply common sense understanding to carry out simple one- or two-step instructions and deal with standardized situations with occasional or no variables in or from the situations encountered on the job. *Id.*  For SVP 2, learning the job requires anything beyond a short demonstration, up to and including one month of learning. *Id.*  Level 2 reasoning requires the worker to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized selections.  *Id.*

Despite the nomenclature changes in the DOT, applicable Social Security regulations still refer to a claimant's ability to perform "skilled," "semi-skilled" and "unskilled" work.  20 C.F.R. § 416.968(a-c); SSR 00-4p.  Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  S.S.R. 00-4p.  Although there may be a reason for classifying an occupation's skill level differently than in the *Dictionary of Occupational Titles*, the regulatory definitions of skill levels are controlling.  *Id.*

///

///

21

## B.  The Contrasting Determinations of Plaintiff's Reasoning Ability

The 2012 hearing decision provided that Plaintiff had the residual functional capacity to perform light work subject to certain positional limitations, occasional interaction with the public, and "one or two step tasks consistent with SVP 2 level work or below as defined by the DOT." AR 147.  Based on vocational expert testimony, the 2012 hearing decision provided that, given Plaintiff's age, education, work experience and residual functional capacity, Plaintiff had the ability to perform the requirements of the following representative occupations:  assembly line worker (DOT 706.684-022; light; unskilled; SVP2), hotel/motel housekeeper (DOT 323.687-014; light; unskilled), and stock check apparel (DOT 299.687-014; light; unskilled).  AR 153.

The 2018 hearing decision provided that Plaintiff had the residual functional capacity to lift and/or carry twenty pounds occasionally and ten pounds frequently; sit six to eight hours in an eight-hour workday with normal breaks; and stand and/or walk six to eight hours in an eight-hour workday with normal breaks.  AR 20.  Plaintiff's capacity closely approximated light work with several additional positional and environmental limitations, and only occasional public contact. Plaintiff was "limited to simple, routine tasks".  AR 20.  In response to the ALJ's question concerning the extent to which Plaintiff's limitations eroded the pool of available positions, the vocational expert testified that given Plaintiff's age, education, work experience and residual functional capacity, Plaintiff had the ability to perform the requirements of occupations such as the following: paint sprayer sorter (DOT 741.687-010; light; SVP 1); marker (DOT 369.687-026; light; SVP 2); and, inspector, hand packaging (DOT 559.687-074; light; SVP 2)  AR 35.

## C.  Identifying the Jobs Available to a Claimant

At step five, an ALJ has a duty to reconcile an apparent conflict between a claimant's residual functional capacity and the reasoning requirements of jobs that the ALJ has identified at step five as jobs that the claimant can perform.  *Zavalin v. Colvin*, 778 F.3d 842, 845 (9th Cir.

2015).  In *Zavalin*, the Court held that there was an inherent conflict between the demands of Level 3 reasoning and a claimant's residual functional capacity to perform simple, repetitive tasks.  *Id.* at 847.

Later in 2015, the Ninth Circuit considered whether a claimant's ability to perform simple, one- or two-step instructions was consistent with performance of a Level 2 job.  *Rounds v. Comm'r, Soc. Sec. Admin.*, 807 F.3d 996 (9th Cir. 2015).  Evaluating Ms. Rounds' case in light of the *Zavalin* decision, the Court wrote:

> Under these circumstances, *Zavalin* is controlling. There was an apparent conflict between Rounds' RFC, which limits her to performing one- and two-step tasks, and the demands of Level Two reasoning, which requires a person to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." The conflict between Rounds' RFC and Level Two reasoning is brought into relief by the close similarity between Rounds' RFC and *Level One* reasoning. Level One reasoning requires a person to apply "commonsense understanding to carry out simple one- or two-step instructions." The Commissioner resists the obvious similarity between Rounds' RFC and Level One reasoning, and the concomitant contrast between Rounds' RFC and Level Two reasoning, by stressing that "task" and "instruction" are different terms. In the Commissioner's view, Rounds' inability to complete multi-step *tasks* does not necessarily contradict the VE's opinion that she has the ability to follow detailed *instructions*, as required in Level Two jobs. Based on the record, we disagree. Only tasks with more than one or two steps would require "detailed" instructions. And these are precisely the kinds of tasks Rounds' RFC indicates she cannot perform.

*Rounds*, 807 F.3d at 1003.

The Court concluded that the ALJ's error was not harmless because in his RFC assessment, the ALJ did not merely restrict Rounds to "simple" or "repetitive" tasks:

> Instead, he expressly limited her to "one to two step tasks," apparently to address her "moderate" problems with memory and concentration. There is no explanation in the record as to why the VE or the ALJ may have believed that Rounds' specific limitation to "one to two step tasks" should not be taken at face value. As such, the record does not support a conclusion that the ALJ's failure to resolve this apparent conflict was harmless error. This Court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision." *Zavalin*, 778 F.3d at 848 (quoting *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050,

1054 (9th Cir.2006)) (holding that ALJ's failure to reconcile apparent
conflict between RFC and DOT was not harmless error).

*Rounds*, 807 F.3d at 1004.

The Court distinguished a residual functional capacity limiting a claimant to one- or two-step tasks from a residual functional capacity limiting the claimant to "simple" or "repetitive" tasks. *Id.* at 1004 n.6.  It explained:

> Unpublished decisions of panels of this Court and opinions from some of our sister circuits have concluded that an RFC limitation to "simple" or "repetitive" tasks is consistent with Level Two reasoning. *See Moore v. Astrue, 623 F.3d 599, 604 (8th Cir.2010); Abrew v. Astrue,* 303 Fed.Appx. 567, 569 (9th Cir.2008) (unpublished); *Lara v. Astrue,* 305 Fed.Appx. 324, 326 (9th Cir.2008) (unpublished); *Hackett v. Barnhart,* 395 F.3d 1168, 1176 (10th Cir.2005); *Money v. Barnhart,* 91 Fed.Appx. 210, 215 (3d Cir.2004) (unpublished). These decisions are inapposite because they did not consider a specific limitation to "one to two step tasks."

*Rounds*, 807 F.3d at 1004.

*Cf., Slaughter v. Colvin*, 164 F.Supp.3d 1256, 1264 (D. Or. 2016) (remanding case for benefits based on other errors but noting the Commissioner's concession that where (1) the reviewing psychologist opined both that the claimant was able to perform jobs with simple one- or two-step instructions and later that the claimant was limited to simple repetitive tasks, the ALJ erred in failing to clarify the psychologist's opinion).

In contending that *res judicata* requires the second hearing decision to use the same language to describe Plaintiff's reasoning ability, Plaintiff reasons that unlike the 2012 decision, which was final and unappealed before the Ninth Circuit issued its holding in *Rounds*, requiring the use of the "one- or two-step tasks language" in the 2018 hearing decision will result in a determination ultimately requiring reversal of the Commissioner's determination that Plaintiff is not disabled.

D. **Does *Res Judicata* Require the 2018 Decision to Adopt the Reasoning Level Set Forth in the 2012 Decision?**

In the Ninth Circuit, when a claimant has applied for and been denied disability benefits in a prior decision, the claimant is presumed not to be disabled in subsequent applications for disability benefits.  *Chavez*, 844 F.2d at 693; Acq. Rul. 97-4(9), 1997 WL 742758.  To overcome

24

the presumption of non-disability in a subsequent application for benefits, a claimant must prove changed circumstances indicating greater disability. *Id.* As discussed above, in the pending case Plaintiff initially overcame the presumption by establishing that he now had aged into a new category and that he had been diagnosed with COPD since the prior decision.

Even when a claimant rebuts the presumption of non-disability the adjudicator, typically the ALJ, must give effect to certain findings contained in the prior claim when adjudicating the subsequent claim. Acq. Rul. 97-4(9), 1997 WL 742758 at *3; *Chavez*, 844 F.2d at 693-94. *Res judicata* applies when the Commissioner has made a previous final decision concerning the parties based on the same facts and the same issue or issues. *See* 42 U.S.C. § 405(h); 20 C.F.R. § 416.1457(c)(1). "[A] previous ALJ's findings concerning residual functional capacity, education, and work experience are entitled to some *res judicata* consideration and such findings cannot be reconsidered by a subsequent judge absent new information not presented to the first judge." *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1173 (9th Cir. 2008). To the extent that the subsequent ALJ's determinations were based on new and material information not presented to the prior ALJ, the subsequent ALJ is not bound by prior ALJ's determinations on the same issues. *Id. See also Alekseyevets v. Colvin*, 524 Fed.Appx. 341, 344 (9th Cir. 2013) ("[T]he ALJ did not err by considering new medical information and revising Appellant's RFC based on recent medical evaluations and results."); *Nursement v. Astrue,* 477 Fed.Appx. 453, 454 (9th Cir. 2012).

Having decided that Plaintiff had successfully established changed circumstances, the ALJ in the pending case fully considered the extensive new evidence provided in support of Plaintiff's claims and then reassessed Plaintiff's residual functional capacity. Because the 2018 determination was based on new medical evidence, administrative *res judicata* did not require adoption of Plaintiff's reasoning ability as determined in the prior proceedings.

///

25

1

### IX.   <u>Conclusion and Order</u>

2

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not

3

disabled is supported by substantial evidence in the record as a whole and is based on proper legal

4

standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of

5

the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of

6

Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff Jonathan Scott

7

Ingles.

8

IT IS SO ORDERED.

9

10

Dated:   **August 24, 2020**            **/s/ Gary S. Austin**
                                        UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26